1      IN THE UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

3
   UNITED STATES OF AMERICA

4
        PLAINTIFF

5
   VS.          CRIMINAL NO. 00-215

6
            CIVIL ACTION NO. 02-180
   PAUL LUCAS

7
        DEFENDANT

8

9

10          PROCEEDINGS
     Transcript of EVIDENTIARY HEARING, commencing on

11   WEDNESDAY, AUGUST 4, 2004, 10:00 A.M., in the United States
   District Court, U.S. Courthouse, Eighth Floor, Pittsburgh,

12   Pennsylvania, before the HONORABLE GUSTAVE DIAMOND, UNITED
   STATES SENIOR DISTRICT COURT JUDGE.

13
   APPEARANCES:

14
   For the Government: By: Kelly Labby, Esquire

15          Assistant U.S. Attorney
        Office of the U.S. Attorney

16         Fourth Floor, U.S. Courthouse
        Pittsburgh, Pennsylvania  15219

17
   For the Defendant: By:  John W. Knorr, Esquire

18         Penthouse Suite
        One Bigelow Square

19         Pittsburgh, Pennsylvania  15219

(Defendant present with counsel.)

20

Reported by:        Sandra Wenger, Official Court Reporter

21                        1017B U. S. Courthouse

                         Pittsburgh, Pennsylvania  15219

22                        412.261.6254


23

Proceedings recorded by mechanical stenography.  Transcript

24   produced by computer-aided transcription.


25


                                    2




1                    I N D E X

2                         - - -

3

WITNESS                  DIRECT  CROSS  REDIRECT  RECROSS

4

V. BAGINSKI, ESQ.        14    25      --      --

5

6                         - - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1      WEDNESDAY MORNING SESSION, AUGUST 4, 2004, 10:00 A.M.

2                    - - -

3      (Whereupon, the following was had in open Court.)

4      THE COURT:  Good morning.

5      MS. LABBY:  Good morning, Your Honor.

6      MR. KNORR:  Good morning, Your Honor.

7          THE COURT:  The Court is convened at this time in

8    the case of United States of America versus Paul Lucas,

9    Petitioner.  This was, originally, Criminal Action No.

10    215009.  It's now Civil Action 02-180.  Civil action being

11    the civil action that was created by the defendant's petition

12    or filing a motion under Section 2255, seeking relief under,

13    under 28 U.S.C., Section 2255.

14          We are convened this morning pursuant to an order

15    of this Court, entered on the ninth day of June of this year,

16    setting this time and place for a hearing solely on the issue

17    created by the defendant when his motion under 2255, where he

18    contends that he received ineffective assistance of counsel

19    because counsel, who had been appointed to represent him at

20    the criminal action, at which he entered a plea of guilty and

21    was sentenced, was allegedly ineffective because he failed,

22    at the defendant's request, he failed to file a notice of

23    appeal, notwithstanding the defendant's request that he do

24    so.

25          Are you ready to proceed?

4

1    MS. LABBY:  Yes, sir, Your Honor.

2    MR. KNORR:  May I, Your Honor?

3    THE COURT:  Yes.  Mr. Knorr.

4    MR. KNORR:  If it please the Court.  My name is

5  John Knorr, counsel for Paul Lucas.  And, at this time, I

6  would make a motion to the Court for leave to withdraw my

7  client's petition under Rule Section 2255.

8    I, as the Court knows, I'm comparatively new to

9  this case, but in the little that I have been involved in it,

10  the time that I met with my client, I have ascertained, as of

11  this morning, and my meeting with my client yesterday in the

12  Allegheny County Jail, he has determined that he does not

13  wish to pursue the issue as it relates to the allegation of

14  ineffective assistance of counsel.

15    He has raised a question concerning the

16  applicability of Blakely versus Washington to his case.  I am

17  not in the position to advise him, much less any attorney in

18  the country, perhaps, as to the likelihood of that case to

19  his case.  But I do know that if he is to pursue relief under

20  2255, the proper forum would be to petition the Third Circuit

21  for permission to amend his 2255 petition to raise that

22  claim.

23      THE COURT:  I believe that's accurate, because it's

24  time.  The time he must have filed has long since passed.

25      MR. KNORR:  I agree, Your Honor.  For that reason,

5

1  we do not wish to pursue the petition as raised this morning.

2      I am asking the Court to permit him to withdraw

3  that, indicating to the Court that it's his intention to have

4  me explore a petition to the Third Circuit.

5      THE COURT:  He's withdrawing all the matters that

6  he presently may have before the Court.  The matter with

7  regard to the Blakely issue has not formally been presented

8  to this Court, at this point, and I understand it,

9  apparently, you had discussed the matter with counsel for the

10  government, who had advised the Court that you might be

11  presenting this matter this morning.  But other than that, we

12  have nothing that's on the record before this Court.

13      MR. KNORR:  That is correct.

14      THE COURT:  What you are saying is that all that is

15  before this Court is the motion under 2255 alleging in-

16  effective assistance of counsel and some other matters that I

17  am not -- I can't outline for you.  But, at this point, there

18  were other matters raised.  You are saying your client wishes

19  to withdraw all of that?

20      MR. KNORR:  Yes, Your Honor.

21      THE COURT:  You better talk with your client and

22  find out.  He seems to indicate disagreement with that.

23      MR. KNORR:  Okay.

24      (Whereupon, an off-the-record discussion was had.)

25      THE COURT:  Now, the 2255 motion was based entirely

6

1   on the ineffective assistance of counsel.  There were nine

2   specifications, the leading one being a failure to file a

3   notice of appeal.

4       But all the others were other allegations of the

5   way that counsel was ineffective.  For example, failing to

6   consult with petitioner regarding pretrial motions,

7   prohibiting defendant from assisting in his defense, failing

8   to contest search warrants, inadequate -- we had hearings on

9   the search warrant, did we not, in this case?

10          Failing to contest the amount of drugs attributable

11   to petitioner, failing to challenge petitioner's role in the

12   conspiracy, failing to argue for downward departure,

13   overstatement of defendant's criminal history category, due

14   to petitioner's emotional, physical disability, and family

15   circumstances.

16          MS. LABBY:  Your Honor, if I may.  The government

17   has responded to all of those in writing.

18          THE COURT:  I know.

19          MS. LABBY:  In a written response.

20          THE COURT:  So, now, you have consulted further

21   with your client and what is his position with regard to what

22   he wants to do here this morning?

23          MR. KNORR:  My client's position is that, on the

24   issue that was scheduled for hearing this morning, he wishes

25   to withdraw his allegation that Mr. Baginski was ineffective

7

1   for failing to file a notice of appeal.  Therefore, there is

2    no need to have an evidentiary hearing on that issue.

3        THE COURT:  All right.

4        Mr. Lucas, is that accurate?

5        THE DEFENDANT:  (Indicating.)

6        MR. KNORR:  Could Mr. Lucas stand?  As he's

7    indicated, he has a little trouble hearing, Your Honor.

8        THE COURT:  Yes.  Come up here.

9        MR. KNORR:  Mr. Lucas, I have indicated to the

10   Court that it is your intention to withdraw that part of your

11   2255 petition that relates to an allegation that your prior

12   attorney, Mr. Baginski, was ineffective for failing to file a

13   notice of appeal.  Is that correct?

14       THE DEFENDANT:  The rest of my 2255 still in

15   effect.

16       MR. KNORR:  It's all still in effect.  We haven't

17   done anything to it.

18       THE DEFENDANT:  Yes.  It's in effect?

19       THE COURT:  Your 2255 motion is still before the

20   Court.  The matter that was set for hearing this morning had

21   to do with the allegation that Mr. Baginski was ineffective

22   because he failed to file a notice of appeal, notwithstanding

23   the fact that you wanted him to do that.

24          Now, we have been advised by your current counsel,

25   Mr. Knorr, that it is your desire to withdraw that portion,

                                    8

1   at least that portion of your motion, under 2255, that

2   alleges that he, Mr. Baginski, was ineffective because he

3   failed to file a notice of appeal.  Is that what you want to

4   do?

5          I think the answer is, yes, but you have to tell

6   us.

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  That's what you want to do?

9          THE DEFENDANT:  Yes.

10          THE COURT:  Now, why is it that you want to do

11   that?

12          THE DEFENDANT:  The prosecution threatening me with

13   --

14          MR. KNORR:  Let me speak for my client, Your

15   Honor.

16          I have explained to my client that the prosecution

17  has advised they believe that any testimony offered in

18  furtherance of his further petition would be untruthful.

19  They believe it would be untruthful testimony and that they

20  would consider very seriously and are considering very

21  seriously prosecuting my client for perjury, in the event

22  that that testimony goes for forward.

23      THE COURT:  That's always the prerogative of the

24  government, if they believe that a witness has testified

25  falsely under oath.


9


1      But, if you believe that your testimony is

2  truthful, Mr. Lucas, you still have the right to pursue it at

3  this point.  The government isn't threatening to bring

4  charges against you if you tell the truth.

5      MR. KNORR:  Your call, Mr. Lucas.

6      MS. LABBY:  Your Honor, if I may interrupt?  I want

7  to be very clear about that.

8      If you feel that you are telling the truth, if you

9  feel, Mr. Lucas, that you are telling the truth, then you

10  testify.  However, it is our belief that, based on your

11  petition, there are inconsistencies and that you have a

12  record before this Court of not testifying truthfully.  That

13  is our position.

14        But if your allegations in this petition are true,

15  then you testify.  Do you understand me?  Can you hear me?

16      THE DEFENDANT:  Yes.  I can hear you.  I don't

17  understand exactly what you are threatening to say.  You said

18  that I didn't testify truthfully?

19      MS. LABBY:  We believe that you have not testified

20  truthfully at prior hearings before this Court.  In your

21  attempt to withdraw your prior plea before this Court, you

22  did not testify truthfully.  That is our position.

23      THE COURT:  It is not the government's position --

24  just a minute.  You are not saying that if the defendant

25  petitioner testifies today, you will bring perjury charges

10

1  based on the testimony that he gave at his suppression

2  hearing; you are not saying that?

3      MS. LABBY:  No.  No.  No.

4          THE COURT:  You are saying that if he testifies

5    today and testifies falsely, today, you will have that option

6    to bring perjury charges against him?

7          MS. LABBY:  Yes, Your Honor.  I am not committing

8    that the government would do that.

9          Your Honor, just let me explain.  Our office is

10   becoming burdened by petitions that are being raised like

11   this by prisoners that are untruthful with an allegation like

12   this, that counsel failed to file a notice of appeal and

13   nothing more.

14          A prisoner, in this circumstance, is automatically

15   entitled to a hearing.  Mr. Lucas, in this case, has

16   inconsistent allegations in his petitions.  That is what we

17   intend to produce at this hearing today, and to demonstrate,

18   and if we can demonstrate that today, it's my position that I

19   will advocate to prosecute you.  I don't have a commitment

20   from my office that we will do that.  However, demonstrated

21   on your past --

22          THE COURT:  All right.  The government is saying

23   nothing more than what the government always has the option

24   to do if they believe that a witness has testified falsely

25   under oath.  The government always has the option to -- of

11

1  presenting the matter to a grand jury and seeking an

2  indictment.

3       But, it is not easy to prove perjury, and the

4  government doesn't generally bring perjury charges.  But you

5  have to be advised, at any time you testify under oath in

6  Court, that you must testify truthfully.  And, if you fail to

7  testify truthfully, that the government can bring perjury

8  charges against you.

9       Now, if you believe that your testimony is truthful

10  here, you should, you should testify, if that's what you

11  believe is, is in your best interests.  You have counsel.

12  Counsel has been appointed to represent you in this matter.

13       Discuss this matter with counsel and decide what

14  you want to do.  We'll give you some more time to do that.

15       MR. KNORR:  Thank you, Your Honor.

16       (Whereupon, an of-the-record discussion was had.)

17       MR. KNORR:  May it please the Court.  My client,

18  after consultation with me, does wish to withdraw the

19  allegation as to ineffective assistance of counsel.  He is

20  concerned that by withdrawing that the Court's going to think

21  he was lying when he made the allegation.

22      We are just saying we are withdrawing it.  We are

23  not pursuing it.  In addition to some factual issues, I have

24  advised him concerning the likelihood of success on that

25  issue from a legal point of view, based on my review of all

12

1  the materials in this case.  But it is his desire to withdraw

2  that portion of his 2255 petition.

3      THE COURT:  Is that entire 2255 petition, is it

4  based on the allegation of ineffective assistance of counsel?

5  There are nine specifics with regard to that.

6      Now, when you say that you want to withdraw the

7  portion of the 2255 that has to do with ineffective

8  assistance of counsel, that's all there is to it?

9      MR. KNORR:  I am sorry, Your Honor.  I misspoke.

10  The allegation of ineffective, as it relates to failing to

11  file the notice of appeal.

12      THE COURT:  That's your desire, Mr. Lucas?

13      THE DEFENDANT:  Yes, sir.

14      THE COURT:  You understand that you are perfectly

15  free, as you stand here today, to come in, to take the

16  witness stand, and to testify as to what you believe

17  transpired between you and Mr. Baginski.

18      Mr. Baginski is here in the courtroom.  He has

19  previously filed an affidavit indicating what has happened,

20  what happened between you and him after your sentencing in

21  this Court.

22      He had a meeting with you on January 12 following

23  your sentencing by this Court.  On the fifteenth, he wrote a

24  letter to you confirming that, and that that's been filed in

25  this case.  Although, it's not as a matter of record at this

13

1  point.  But I want it to be a matter of record in this

2  hearing.

3      So, at this point, you are stating that you don't

4  want to testify because you fear the possibility that the

5  government will file perjury charges against you; is that

6   right?

7        THE DEFENDANT:  Yes, sir.

8        THE COURT:  All right.  You don't have to testify.

9   I want the government to support it's position that

10  Mr. Baginski did, in fact, give, discuss the matter with the

11  defendant in this case.  The petitioner in this case.

12        Put in your case, so we have a record with regard

13  to that.  Defendant hasn't testified.  Technically, he hasn't

14  met his burden of proof.  But I believe, in order for this

15  record to be in proper shape, since Mr. Baginski is here,

16  since his integrity has been impugned, he should have the

17  opportunity to testify and to support his position, that he

18  didn't, in fact, file the notice of appeal because it was the

19  defendant's desire not to file a notice of appeal having been

20  advised by Mr. Baginski as to the pros and cons of doing so.

21        MS. LABBY:  Yes, Your Honor.  The government calls

22  Mr. Baginski.

23        VINCENT BAGINSKI, ESQUIRE, A WITNESS, having been

24  first duly sworn, was examined and testified as follows:

25        THE WITNESS:  Good morning, Your Honor.

14

1           DIRECT EXAMINATION

2   BY MS. LABBY:

3   Q    Good morning.

4   A    Good morning.

5   Q    How long have you been of service as a defense attorney?

6   A    I graduated from Duquesne Law School in 1974.  So, this

7   will mark my thirtieth year, where I was admitted in October

8   of '74.

9   Q    And how many criminal cases have you handled over the

10  course of your career?

11  A    Hundreds and hundreds of cases.  If we were to include

12  cases that were disposed of by means of agreements at

13  preliminary hearings, I would venture to say it would be in

14  the thousands.

15  Q    You represented Mr. Lucas at all stages of the

16  proceedings in this case -- in District Court?

17  A    I did.

18  Q    Mr. Lucas entered a plea agreement in this case?

19  A    Yes, he did.  On the date that we actually were

20  scheduled for trial.

21  Q   You negotiated, among other things, that he was to

22  receive three points for acceptance of responsibility?

23  A   Correct.

24  Q   He later attempted to withdraw his plea; is that

25  correct?

15

1   A   Yes, he did.

2   Q   He was unsuccessful in that effort; was he not?

3   A   That's correct.

4   Q   There was a hearing and the motion to withdraw that

5   plea; is that correct?

6   A   Yes.  Early January, I believe it was.  I have never

7   read the transcript, but I recollect that, that that was

8   prior to the sentencing.

9   Q   He gave sworn testimony at the hearing?

10  A   Yes, he did.

11  Q   The Court in the exercising of its discretion declined

12  to allow him to withdraw the plea, and we covered that?

13  A   That's correct.

14  Q   Based upon his testimony, you, you had concerns that the

15   government might have grounds for obstruction of justice and

16   enhancement at sentencing?

17   A   I was more than concerned.  I thought that they could

18   succeed.

19   Q   Did you also have grounds that the government might have

20   concern or concern on your part that the government might

21   have ground for the one-point for acceptance of

22   responsibility that the Court might deny that?

23   A   My recollection of the motion to withdraw hearing was

24   that Mr. Ivory, representing the government, during the

25   course of this case, had initially requested that five points

16

1   be added to the offense level for Mr. Lucas.  Initially,

2   during that --

3        MR. KNORR:  I am sorry, Your Honor.  My client's

4   indicating that he can't hear.  Could we give him a seat a

5   little closer?

6        THE COURT:  Move his seat.

7        THE WITNESS:  I'll try to talk a little louder,

8  Mr. Knorr.  Does that help?

9          THE COURT:  Whatever he wants.  Do you need to be

10  closer?  Is that close enough?

11          MR. KNORR:  When he talks.

12  BY MS. LABBY:

13  Q    Okay.  You met with Mr. Lucas following sentencing to

14  discuss an appeal?

15  A    I did.  If you want me to go further with my concern

16  there?

17  Q    I am sorry.  Yes.

18  A    What had happened was, during the course of the motion

19  to withdraw, Mr. Ivory had indicated that he was requesting

20  that five points be added to the offense level.  I believe

21  that was his initial request.  And that, now, based upon the

22  motion to withdraw, that he should be, the three points total

23  that he had for acceptance should be taken back and should be

24  assessed against Mr. Lucas.

25          Two is Mr. Ivory was arguing that two points should be

17

1  added on to the offense level score, in that he was arguing

2  obstruction of justice based on entering a plea of guilty,

3  having said I'm guilty, and then coming in and withdrawing

4  his plea, saying, no, that is incorrect.

5      During the course of that, Mr. Ivory, I believe I have

6  never read that transcript, but I believe Mr. Ivory then

7  reduced his request and then asked Judge Diamond simply to

8  add on one point, taking back an acceptance of responsibility

9  and adding on two points for obstruction of justice.  Judge

10  Diamond didn't add on any points.

11  Q    You met with Mr. Lucas following sentencing to discuss

12  an appeal; is that correct?

13  A    Yes.  Absolutely.

14  Q    Where did you meet with him?

15  A    During the whole time I represented Mr. Lucas, he was

16  incarcerated at the Allegheny County Jail.  He was held

17  pending trial.

18  Q    I am sorry?

19  A    He was held pending trial.

20  Q    You discussed appealable issues with him at that time?

21  A    Absolutely.

22  Q    What did you discuss as potentially appealable issues?

23   A    Well, we had had a suppression argument based on search

24   warrants that had been issued in the case.  However, we

25   didn't enter a special plea reserving any right concerning an

18

1    appeal to argue that.  And my opinion, at that point was that

2    Judge Diamond's multi-page opinion was right on point and we

3    had no possibility of succeeding, even if we would have had

4    that as an issue for appeal.

5         We didn't have any sentencing issues, but we discussed

6    what potentially might be a sentencing issue.  But the plea

7    agreement actually said the offense level based upon drug

8    quantity.

9         Then we had the two points added on that we had agreed

10   to as concerning late organizer.  That wasn't a factual

11   determination that was made by Judge Diamond.  The guideline

12   was within the sentence.  In fact, my recall is that after

13   sentencing, Judge Diamond had reduced the sentence.  So, what

14   we discussed was, literally, my feeling that all we could

15   present to the Third Circuit was that Judge Diamond had

16   abused his discretion in not granting Mr. Lucas's motion to

file:///A|/LUCAS.TXT

17   withdraw.

18       That, literally, was what I thought we could appeal to

19   the Third Circuit.  I thought, well, maybe we could throw in

20   some other things, but that really would have been the key

21   issue.

22       However, again, I have never read the transcript, but

23   my recall is that Judge Diamond instructed me to advise

24   Mr. Lucas, because I had not done so previously, and I

25   believe I stood up and said that, in Court, the date of the

19

1   hearing.  But Judge Diamond, I believe, directed me to make

2   sure that Mr. Lucas was advised that if he filed an appeal,

3   the government may, at that point, there was no doubt in my

4   mind, based on my conversations with Mr. Ivory, that they

5   would file a cross appeal, requesting the addition of the one

6   point for acceptance and the two points for obstruction.  And

7   I thought that that was placing him in an horrendous,

8   horrendous risk situation.  I really felt they could succeed

9   with that.

10  Q    And the judge, although doing that, did not dissuade the

11  defendant from taking an appeal; is that correct?

12  A    No.  No.  Not at all.  Because I had not advised him of

13  that prior to the hearing on the motion to withdraw, Judge

14  Diamond was just saying, Mr. Baginski, don't forget to tell

15  him about these things.

16      It wasn't a threat.  It was just, hey, Vince, make sure

17  that you do this.

18  Q    Did you do so?

19  A    Absolutely.

20  Q    When you left the jail that day, after consulting the

21  defendant, what was the understanding that you had reached

22  with him?

23  A    The understanding was that Mr. Lucas did not want to

24  pursue an appeal to the Third Circuit Court of Appeals.

25  Q    Did you have any reason to think that he did not

20

1  understand or comprehend the agreement that you had reached?

2  A    None whatsoever.  He understood that the risk absolutely

3  outweighed the possibility of success.

4        MS. LABBY:  If I may introduce Government Exhibit

5    A, Your Honor.

6    BY MS. LABBY:

7    Q    You wrote a letter to your client on January 15; is that

8    correct?  Do you recall that?

9    A    Yes.

10    Q    I show you a copy.  Is the letter written on your

11    letterhead?

12    A    Yes, it is.

13    Q    Is it signed by you?

14    A    No.  This copy is not.  Mr. Lucas, I believe, would have

15    received the original.

16    Q    Okay.

17    A    I typically don't sign file copies.  I may put an S,

18    slash.

19    Q    Okay.  I see.  Did the letter confirm your

20    understanding?

21    A    Yes, it did.

22    Q    I just wanted to direct your attention to paragraph 3.

23    It reads, "As we discussed, any appeal of your case to the

24    Third Circuit would be limited to the Court's discretionary

25   denial of your motion to withdraw guilty plea, in that the

21

1   likelihood of success is extremely small compared to the

2   extremely great likelihood that the anticipated government's

3   cross appeal of the Court's denial of their request for a one

4   point acceptance of responsibility and a two point increase

5   of obstruction of justice in your offense level, the risk is

6   enormous.  Accordingly, I have not and will not file an

7   appeal of your case to the Third Circuit."

8   A   Is that accurate?

9   Q   Accurately read?

10   A   Yes.

11   Q   Why did you send a letter?

12   A   It's pretty much my standard procedure that, if there

13   are things that I'm requested to do or not do, you typically

14   write -- I typically write confirming letters.  Paragraph one

15   and two address things that I had also told Mr. Lucas that I

16   would do.  So, it's a confirming letter in respect to all

17   three of those items in those paragraphs.

18   Q   Now, I'll show you what's marked as Government Exhibit

19  B.  I would just like to direct your attention, -- first of

20  all, is this the letter that you recall receiving from your

21  client?

22  A    Yes.

23  Q    Dated March 28, --

24  A    Yes.

25  Q    -- 2002?  Directing your attention to the top paragraph.

22

1  It reads, "Since I have neither heard from you, nor from the

2  Court of Appeals for the Third Circuit, I am filing a new

3  notice of appeal in the, the above matter."  Is that

4  accurate?

5      Is that an accurate reading?

6  A    Yes.

7  Q    What was your reaction when you received the letter?

8  A    Total surprise.

9  Q    Why?

10  A    He had never directed me to file an appeal.  In fact, it

11  was the contrary.  He had agreed with me that we would not

12  file an appeal.

13  Q    Did you respond to the letter?

14  A    Yes, I did.

15  Q    I would like to show you what is marked as Government

16  Exhibit C.

17       THE COURT:  You have identified two exhibits, A and

18  B.  You haven't offered them in evidence, but you have had

19  testimony concerning the contents.  Are you offering them in

20  evidence?

21       MS. LABBY:  Yes, I am, Your Honor.  I am sorry.

22       THE COURT:  Any objection?

23       MR. KNORR:  No objection.

24       THE COURT:  A and B are received in evidence.

25       MS. LABBY:  This is Exhibit C, Your Honor.

23

1        THE COURT:  If there is no objection by counsel to

2  Exhibit C?

3        MR. KNORR:  Correct.

4        THE COURT:  It's admitted.

5  BY MS. LABBY:

6   Q    Would you read the first two paragraphs for the Court?

7   A    "This letter acknowledges my receipt of your letter,

8   dated May 28, 2002, that was received by me in this morning

9   mail.  Paul, quite frankly, I am surprised by your letter.

10  Enclosed please find a copy of my letter to you dated

11  January 15 2002.  You will note that it was a letter

12  confirming our meeting at the Allegheny County Jail on

13  Sunday, January 13, 2002, wherein, essentially, you and I

14  agreed that no appeal would be filed with the Third Circuit

15  Court of Appeals.  Your letter mentions a new notice of

16  appeal.  I did not file an appeal.  If you had previously

17  done so, would you please supply me with a copy of it, as

18  well as a copy of the new one."

19  Q    Why did you send this letter to Mr. Lucas?

20  A    I was totally surprised.  In fact, it's based on

21  day-to-day office procedures and schedules and hearings and

22  cases that I am involved in.  It's really strange, after I

23  had reviewed this letter, to see that I responded that same

24  day.  Sometimes it takes me a while to respond.  But I was so

25  surprised by this that I wrote him a letter that day.

24

1  Q   You make it a practice to discuss matters of appeals

2  with your clients; is that correct?

3  A   Always.

4  Q   You consulted with Mr. Lucas in this case?

5  A   Yes.

6  Q   Did you consult about the benefits and dangers of an

7  appeal; correct?

8  A   Yes.  I still feel I haven't researched the issue but I

9  still think he is in the same jeopardy.  If he is allowed to

10  file the appeal.  I think he's still in the same jeopardy,

11  again, not researching the issue, because I'm here to

12  testify.  But the government may well have the opportunity to

13  file the cross appeal now, at this stage, to request those

14  three points.

15  Q   Just to summarize.  You reached a decision not to

16  appeal; is that correct?

17  A   That was a joint decision.

18  Q   Had Mr. Lucas told you he wanted you to file a notice of

19  appeal, against your advice, would you have filed it?

20  A   Yes.  I also would have written a letter saying that it

21   was against my advice, but I certainly would have done so.  I

22   have pursued other appeals to the Third Circuit Court of

23   Appeals on numerous occasions.

24        MS. LABBY:  Thank you.

25        THE COURT:  Cross-examine.

                              25


1             - - -

2             CROSS-EXAMINATION

3    BY MR. KNORR:

4    Q    Mr. Baginski, do you recall attending a detention

5    hearing on behalf of Mr. Lucas?

6    A    Yes.  That was correct.  The government had filed a

7    motion to detain pending trial.

8    Q    And Mr. Lucas advised you and he was ordered to be

9    detained; correct?

10   A    Correct.

11   Q    Did you discuss the appealability of that decision by

12   the United States Magistrate-Judge?

13   A    Sure.

14  Q    And do you recall what his advice to you was concerning

15  that?

16  A    Well, I can't give you a specific.  I'll give you the

17  end result.  It was not to take an appeal of that decision

18  but there was many more conversations that led up to that.

19      As you know, we could have, in fact, requested that the

20  local District Court Judge review the determination that had

21  been made by the Magistrate-Judge.  The issue in the case is

22  whether or not there is a danger to the community and whether

23  or not there is a risk of flight.  Those are the two issues.

24      Based -- and I didn't review my whole file as concerns

25  that, but I recall this.  I think Agent Hoy testified or an

26

1  agent testified based upon the charges there was already the

2  presumptions for both of those two considerations.

3  Q    Do you happen to remember whether you advised Mr. Lucas,

4  when he said I want to appeal, initially, the decision that

5  he be detained, that that could be done at a later time?

6  A    Yes.

7  Q    Do you recall having a discussion with Mr. Lucas

8   concerning the denial of the motion to suppress in the

9   pretrial motions?

10   A   Yes.

11   Q   Do you know whether Mr. Lucas at that time advised you

12   that he wished to appeal the denial of those motions?

13   A   I don't recall, specifically, but I would think that

14   it's the situation where routinely we'll discuss the

15   determination of suppression issues, pretrial motions,

16   knowing that those are basically interlocutory in nature.

17       That, subsequently, if we would go to trial, then we

18   would have the right to appeal that issue.  So, even though I

19   can't recall a specific conversation with Mr. Lucas, I would

20   be pretty certain that we had that kind of conversation.

21   Q   And you subsequently negotiated a plea agreement with

22   the government that did not preserve in any special way the

23   appealability of those pretrial issues; is that correct?

24   A   Yes.  That's correct.  We didn't do a special plea

25   under, I think it's Rule 11(e).

27

1    Q    Do you happen to remember whether you made it clear to

2    Mr. Lucas that he was giving up his right to appeal those

3    pretrial issues?

4    A    Yes.  That was a wild and crazy morning.  Actually, we

5    were prepared to go to trial.  It was a Monday morning.  Seem

6    to think it was October 11.  That's what my recall seems to

7    be right now.

8        And, in fact, I had met with Mr. Lucas in the jail on

9    both Saturday and Sunday, reviewing, generally discussing his

10   case.  Next thing we come in, Mr. Lucas comes in, wants me to

11   negotiate a plea.  I was negotiating the plea with both

12   Mr. Teitelbaum and Mr. Ivory, because Mr. Teitelbaum had had

13   the case previously.

14       I spent considerable time in the U.S. Marshal's Office.

15   And, in fact, Mr. Ivory and Mr. Teitelbaum were calling me on

16   the cell phone.  And we had a big discussion as concerning

17   what was left to appeal, what was not left to appeal, what we

18   were doing here, what we were doing there.

19       There is no doubt in my mind that Mr. Lucas knew what

20   the plea agreement was.  What we were attempting to do is

21   rather than go in blind-faced, we were trying to figure out

22   what the drug quantity amount would be.  What, in fact, any

23  add-ons would be.

24     We were uncertain as to the criminal history category,

25  based upon numerous disclosures that had, that had been made

28

1  by Mr. Lucas to me as concerns prior record.  No question in

2  my mind he knew and he agreed that that was the plea

3  agreement and, literally, we were not going to have anything

4  left to appeal.  No question in my mind that was ongoing

5  discussions.

6     Mr. Lucas, as I recall, even said, well, what we will --

7  we have left here?  What can we do here?  I attempted to get

8  Mr. Ivory and Mr. Teitelbaum to do a less than two kilos, but

9  they absolutely refused.  I attempted to get them to not

10  pursue the later organizer, but they absolutely, positively

11  would not.  Simply, we were listed for trial.  Their

12  witnesses were here.

13     MR. KNORR:  May I have a moment, Your Honor?

14     (Whereupon, an off-the-record discussion was had.)

15  BY MR. KNORR:

16  Q    Was there a time at which the government had offered a

17  plea to less than two kilos?

18  A    Absolutely.  No doubt in my mind.  In fact, I was upset

19  that morning with Mr. Teitelbaum.  My recall of my

20  conversations with Bruce in advance is they had said, he,

21  initially, said, well, Vince, if your client pleas to two

22  kilos, then we'll do this, we'll do that.

23      I called Bruce on the phone and I said, hey, he said,

24  two.  That's the number.  That starts this category.  And

25  that category, up to two and up to 2.35.  My recall of my

29

1  conversations with Mr. Teitelbaum, he said, okay.  We'll do

2  less than two.

3      At that point, they were not going to add on the two

4  points for later organizer.  I was totally upset with

5  Mr. Ivory and Mr. Teitelbaum.  That's why Mr. Teitelbaum was

6  involved in our conversations that morning, because I kept

7  telling Mike, well, Bruce had offered me that a long time

8  ago.  Bruce had no recall of that simply because we didn't

9  have any written record.  I made no question.

10      I relayed that offer to Mr. Lucas.  That was, that was

11  months in advance.  I'm thinking that was the summer, July,

12  August, of 2001.  And now, because we were listed for trial,

13  that just --.

14  Q   When did you learn that the plea was going to have to be

15  to more than two kilos?

16  A   That morning.

17  Q   The morning of the plea?

18  A   Correct.

19  Q   And prior to that, your discussion with Mr. Lucas

20  assumed that the plea was going to be relatively to the offer

21  that had been made by Mr. Teitelbaum to less than to kilos?

22  A   No.

23  Q   No?

24  A   There was a point in time, my recall would be a week,

25  two weeks, prior to the actual trial date.  And I have

30

1  experienced this a lot of times with AUSAs, that say, hey,

2  Vince, what's your client going to do?  Look, we are not

3   going to hold this offer out forever.  That if, in fact, your

4   client doesn't accept this offer, we are withdrawing our

5   offer.

6       So, there was a point in time, I don't remember, a week,

7   two weeks, three weeks, I don't specifically recall.  So, on

8   that, on that particular morning, there was no offer that was

9   still out there by the government.  It was renegotiating an

10  offer.  And, again, without being redundant, that's why

11  Mr. Teitelbaum was also involved in these conversations,

12  because he initially had the case.

13  Q   Did Mr. Lucas express to you his displeasure with the

14  fact that he was not pleading to less than two kilos as had

15  been offered previously?

16  A   Oh, sure.  He made that quite clear.  I made this quite

17  clear to the AUSA, as well.

18  Q   Did you make it clear that he wasn't pleading guilty to

19  less than two kilos, as the record indicates?

20  A   Absolutely.  We had, we had lengthy discussion as

21  concerns the fact that, you know, I could not get back the

22  less than two kilo offer.

23  Q   Now, would you consider Mr. Lucas, during the period of

24  your representation, what you might refer to as a high

25   maintenance client?

31

1   A   Yes.

2   Q   He need a lot of attention?

3   A   We have known each other a long time.  You've practiced

4   defense work for a long time.  I think we share that same

5   high maintenance definition in our minds.

6   Q   He tried to -- he wanted to have a lot of contact with

7   you?

8   A   Sure.

9   Q   Did he call you on the phone; do you recall?  Did your

10   office accept collect calls from the jail?

11   A   We do when somebody is there.  I am a sole practitioner.

12   I have a law clerk who typically works with me.  I do not

13   have a secretary.  My secretary has been replaced by voice

14   recognition software.  I talk to my computer.

15   Q   Recognizing him as, for lack of a better phrase, as a

16   high maintenance client, was it unusual that, that you did

17   not hear from him between the date of your letter to him,

18  January 15, and his letter to you, March 28?

19  A    No, not unusual at all.

20  Q    Why was that not unusual?

21  A    Typically, his case was over.  I had not been directed

22  to file an appeal.  My letter to him, I think my letter,

23  basically, says, when you get classified designated, I don't

24  know if I used that terminology, but when BOP places you

25  somewhere, let me know just in the event that there is

32

1  anything to keep you advised of or to keep you aware of.

2  Typically, it takes some clients -- I never get their new

3  address.  They don't respond to me, ever.

4       But, no, not -- his case was over and, you know, I

5  expected to get a letter simply because I believe, I believe

6  I was still attempting to get properties returned that had

7  been taken during the course of a search that the government

8  really had not wanted to retain.

9       MR. KNORR:  That's all I have, Your Honor.

10      THE COURT:  Redirect?

11      MS. LABBY:  Your Honor, we have nothing.  Thank

12  you.

13        THE COURT:  Thank you, Mr. Baginski.

14        (Whereupon, the witness was excused from the

15  witness stand.)

16        THE COURT:  Government have anything else?

17        MS. LABBY:  No.  Thank you.

18        THE COURT:  Mr. Lucas, step up here.

19        Now, earlier, you have the burden of proof on this,

20  which means that, normally, you would have to establish at

21  least a prima facie, some basis, for the Court to rule in

22  your favor before even the government is required to respond.

23        But because of the statements you made concerning

24  your fear of perjury and so forth, and rather than to simply

25  have this record not have the statement of an attorney who

33

1  has been accused of ineffectiveness, I have permitted

2  Mr. Baginski to testify and also to give you an opportunity

3  to cross-examine him.  And that has been done.

4        Now, even though I stated to you earlier that you didn't

5  have to testify, you have the right to testify if you want to

6  do so.  And I'll give you that right to testify now if you

7  wish to testify.  You don't have to.  I'll make my ruling if

8  you don't testify.  But, if you wish to testify, you're free

9  to do it.

10       THE DEFENDANT:  I'm not going to testify.

11       THE COURT:  You don't want to testify?

12       THE DEFENDANT:  No.  Yes, sir.

13       THE COURT:  That's your privilege.  You may be

14  seated.

15       THE DEFENDANT:  (Indicating.)

16       THE COURT:  The hearing is closed on the question

17  of the ineffective assistance of counsel, based upon on

18  failure of counsel to file a notice of appeal when requested

19  to do so.  The Court has received the testimony of

20  Mr. Baginski.

21       The Court finds the witness to be an entirely

22  credible witness and accepts his testimony in toto.  There is

23  nothing, there was no basis on cross-examination, or in any

24  other way to question the credibility of the witness, and the

25  Court accepts the witness's testimony.

1        That testimony was corroborated by letters that

2    were received in evidence here, particularly, the letter

3    dated January 15, 2002, from Mr. Baginski to his client, his

4    then client, Mr. Lucas, which summarized a meeting that was

5    held on the previous Sunday, January the thirteenth of 2002,

6    wherein Mr. Baginski indicated that they had discussed the

7    pros and cons of an appeal and that Mr. Baginski had the

8    understanding that an appeal would not be filed.  And he

9    stated, unequivocally, that he would not file an appeal.

10        There was no indication that that letter was not

11    received or that, in the ordinary course of business, it

12    would not have been received.

13        The Court finds, therefore, that the allegation

14    that counsel was ineffective for failing to file a notice of

15    appeal has not been sustained, and the motion for relief

16    under 2255, based on that aspect, will be denied.

17        The Court further notes that at the sentencing, as

18    is the custom of this Court, the Court advised Mr. Lucas that

19    he had the right to appeal the sentence, that he had

20  competent counsel who would file a notice of appeal in his

21  behalf if the defendant requested him to do so.  Requested

22  counsel to do so.  But, if there was any difficulty in that

23  regard, the defendant could affect an appeal himself by

24  contacting the Clerk of this Court and requesting that the

25  Clerk file a notice of appeal in behalf of the defendant.


35


1        Obviously, that was, the defendant did not pursue

2  that.  So, if there was any disagreement with counsel,

3  Mr. Baginski, on January the thirteenth, 2002, with regard

4  to an appeal, the defendant had knowing notice as to how he

5  could affect the appeal himself, simply by contacting the

6  Clerk of this Court to do so.

7        This Court finds no merit in the defendant's

8  allegation in support of his motion under 2255 that counsel

9  was ineffective for failing to file a notice of appeal.  The

10  other matters that were raised on the 2255 remain open.  The

11  Court will make a ruling with regard to those matters.

12        Anything else at this time?

13        MS. LABBY:  No, Your Honor.

14          THE COURT:  Mr. Knorr?

15          MR. KNORR:  Your Honor, my appointment in this

16  matter was specifically limited to this hearing.

17          THE COURT:  That's right.

18          MR. KNORR:  Am I free to investigate the question

19  of petitioning the, the Third Circuit under the Court's order

20  appointing me?

21          THE COURT:  Do that.  You, your appointment will

22  include that, since you are involved up to this point.

23          Normally, we do not appoint counsel on 2255 motions

24  unless there are certain other extenuating circumstances to

25  justify that.  But, in this case, with regard to the, to that

36

1  issue, you may do that and that will include, that will be

2  included in the scope of your, your appointment.  But that's

3  the end of it.

4          MR. KNORR:  I understand, Your Honor.

5          THE COURT:  Unless you further petition the Court.

6          MR. KNORR:  Thank you, Judge.

7          THE COURT:  All right.  Anything else?

8          MS. LABBY:  No.  Thank you.

9          THE COURT:  Court's adjourned at this time.

10          THE DEPUTY CLERK:  All rise.

11          (Whereupon, the hearing was adjourned at 11:15 a.m.

12   on the fourth day of August, 2004.)

13                    - - -

14                C E R T I F I C A T E

15          I certify by my original signature herein that

16   the foregoing is a correct transcript from the record of

17   proceedings in the above-entitled matter.

18

19
                        Sandra Wenger
20                      Official Court Reporter

21
          *****NOT CERTIFIED WITHOUT ORIGINAL SIGNATURE*****
22

23

24

25